**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

JOE EDWARD MORRIS, PH.D.                                        **PLAINTIFF**

VS.                                              **CAUSE NO. 3:15-CV-00163-MPM-RP**

CCA OF TENNESSEE, LLC                                        **DEFENDANT**


## ORDER

This cause comes before the court on the motion of defendant CCA of Tennessee, LLC ("CCA") for summary judgment, pursuant to Fed. R. Civ. P. 56. Plaintiff Joe Edward Morris, Ph.D. has responded in opposition to the motion. This court, having considered the memoranda and submissions of the parties, concludes that the motion should be granted in part and denied in part.

This is a wrongful termination action, based on Mississippi law, arising out of plaintiff's firing as a psychologist at the Tallahatchie County Correctional Facility (TCCF), a private prison located near Tutwiler. Plaintiff, who has a Ph.D. in psychology, has maintained a private practice in north Mississippi since 1980. [Morris Dep. at 13]. In 2014, plaintiff, with the assistance of an attorney, negotiated an agreement with CCA to provide part-time psychological services at TCCF. Plaintiff and CCA agreed in their contract that he would be an independent contractor, and they likewise agreed that either side could cancel the contract with thirty days' notice. [Defendant's exhibit B]. The parties also agreed that, upon a material breach by plaintiff, CCA could immediately terminate the agreement.

Soon after starting work at TCCF, plaintiff began experiencing difficulties in his relationship with Dr. Dan Murphy, another psychologist at TCCF. Dr. Murphy had more experience at TCCF than plaintiff, and the record suggests that he sought to serve as a mentor of sorts to plaintiff when he was hired to work at the prison. The record indicates that plaintiff took exception to Dr. Murphy's leadership, and, in a contemporaneous email, he expressed his view that he was being treated like a "small child" by Dr. Murphy. [Plaintiff's exhibit 14]. The disagreements among these two men culminated in Dr. Murphy writing, on February 24, 2015, an email to CCA management, in which he alleged that plaintiff had, on three occasions, provided substandard care to patients and should not be granted the full-time position which he was seeking at the prison. [Plaintiff's exhibit 17]. After reviewing these allegations, Dr. John Baxter, in his capacity as Vice President of Health Services for CCA, determined that plaintiff had committed a material breach of his contract which justified his immediate termination, without thirty days' notice. Feeling aggrieved, plaintiff filed the instant diversity action in this court, seeking both contractual and tort damages arising out of the decision to fire him.

In considering plaintiff's tort claims against CCA, this court begins with the fact that Mississippi is an employment at will state and as such, in the vast majority of contexts, an employee can be lawfully fired for any reason, without a showing of "good cause." As discussed below, a different analysis applies to plaintiff's breach of contract claim, which is dependent upon the terms of his employment contract with CCA. It appears (but is not certain) that any potential contractual damages in this case may be relatively minor, and it is therefore unsurprising that plaintiff has chosen to concentrate heavily on his tort claims. This court will therefore discuss plaintiff's tort claims first, even though it concludes, as discussed below, that

his breach of contract claim is the only one which survives summary judgment in this case.

Plaintiff asserts two tort claims against CCA in this case, namely 1) a claim that he was fired for refusing to engage in unlawful conduct, in contravention of the Mississippi Supreme Court's decision in *McArn v. Allied Bruce-Terminix Co., Inc.*, 626 So.2d 603 (Miss. 1993); and 2) a tortious breach of contract claim alleging that his firing was so malicious as to constitute an independent tort. This court will discuss the elements of these two causes of action in turn.

In seeking to recover under *McArn*, plaintiff correctly notes that, in that decision, the Mississippi Supreme Court established a narrow exception to the employment at will doctrine, writing that:

> We are of the opinion that there should be in at least two circumstances, a narrow public policy exception to the employment at will doctrine and this should be so whether there is a written contract or not: (1) an employee who refuses to participate in an illegal act . . . shall not be barred by the common law rule of employment at will from bringing an action in tort for damages against his employer; (2) an employee who is discharged for reporting illegal acts of his employer to the employer or anyone else is not barred by the employment at will doctrine from bringing action in tort for damages against his employer.

*McArn*, 626 So.2d at 607. Plaintiff relies upon the first of these two exceptions here, alleging (in a manner seemingly contradicted by some of his other allegations) that he was fired for refusing to change his diagnoses of certain patients, when asked to do so by Dr. Murphy. With regard to plaintiff's second cause of action, "[t]ortious breach of contract requires, in addition to a breach of contract, some intentional wrong, insult, abuse, or negligence so gross as to constitute an independent tort." *Southern Natural Gas Co. v. Fritz,* 523 So.2d 12, 19-20 (Miss.1987)*.* "In addition to a breach of contract we must find some intentional wrong, insult, abuse, or negligence so gross as to constitute an independent tort in order to support a claim for tortious breach of

contract." *Fritz,* 523 So.2d  at 19-20.

In the court's view, there is considerable overlap between plaintiff's two tort claims against CCA, and the same weaknesses in his proof are fatal to both claims.  In so stating, this court concludes that plaintiff's most fundamental problem is that his own description of why he was fired does not match the causes of action he asserts.  In his brief, plaintiff provides the following explanation for why he was fired:

### V. Real Reason Dr. Morris was Terminated

Dr. Murphy maliciously lied about Dr. Morris to his bosses. [Dr. Morris depo., p. 143] Dr. Murphy felt threatened by Dr. Morris, because Dr. Morris was popular with the staff and Dr. Murphy was not.  [Dr. Morris depo., p. 145].  Dot Strong testified that Dr. Morris was very popular with the staff, but Dr. Murphy was not. [Strong depo., pp. 7-8].  Dot confirmed that Dr. Murphy had a grudge against Dr. Morris and was out to get him. [Strong depo., pp. 11-12].

Dr. Morris was never written-up or counseled while working at TCCF. [Gurley depo., p. 23] Dot Strong was not aware of any issues with Dr. Morris' job performance, and would have known if there were any issues, "because they would have brought them to me." [Strong depo., p. 8] Dot Strong thought Dr. Morris' job performance was excellent: "Inmates liked him and he was liked by the staff." [Strong depo., p. 8] Dot Strong was not aware of Dr. Morris violating any policies or procedures of CCA. [Strong depo., pp. 20-22] In fact, inmates would specifically request to see him. [Strong depo., p. 25] Strong was shocked and hurt when she found out that Dr. Morris was fired. [Strong depo., pp. 32-33, 44].

A reasonable jury could conclude that Dr. Murphy sent the slanderous email up to the chain [sic] which led to Dr. Morris' termination because he did not want Dr. Morris to have the full-time position due to personal animosity, caused in part because Dr. Morris refused to falsify his medical records.

[Plaintiff's brief at 17-18].

Thus, plaintiff's own explanation for his firing is overwhelmingly based upon allegations of misconduct against Dr. Murphy, arising out of that individual's alleged "personal animosity"

4

towards him. That fact is quite problematic for plaintiff's tort claims, since Dr. Murphy is not a defendant in this action, and any wrongful misconduct by an employee based on his own "personal animosity" is difficult (if not impossible) to impute to the employer, for the purposes of Mississippi's very limited exceptions to the employment at will doctrine. Indeed, it should be apparent that the first reason cited by plaintiff for Dr. Murphy's animosity, namely plaintiff's allegedly being more popular among staff, is of no apparent concern whatsoever to CCA.

Dr. Murphy has since passed away, and it is unclear to this court whether plaintiff's failure to name his estate as a defendant arises from some legal or practical impediment to doing so. Regardless, the sole defendant in this case is CCA, and that is the party against whom plaintiff must establish liability in this case. CCA argues that Dr. Murphy served as an independent contractor at TCCF, but, regardless, this court does not believe that his employment status greatly changes the analysis in this context. The same conclusion applies to plaintiff's employment status, which the parties similarly dispute.[1] In so stating, this court emphasizes once

---

[1]In briefing the *McArn* issues in this case, the parties spend a considerable amount of time discussing whether plaintiff was an employee or an independent contractor and whether, assuming he was the latter, he might properly assert a *McArn* claim arising out of his termination. In the court's view, defendant has the better of the argument on both these issues. In agreeing with CCA that plaintiff acted as an independent contractor in this case, this court finds particularly persuasive the fact that he specifically expressed a desire to have this status in negotiating the terms of his employment contract. For example, in email negotiations, plaintiff stated that he "lean[ed] more toward a contract than employee status," noting that he was "semi-retired." [Defendant's exhibit "d"]. As noted previously, the contract in this case expressly adopts plaintiff's preference in this regard, stating that he was an independent contractor.

Moreover, this court agrees with defendant that the Mississippi Supreme Court has not, to date, extended *McArn* to claims asserted by independent contractors. In arguing otherwise, plaintiff relies upon *Roop v. Southern Pharmaceutical Corporation*, 188 So. 3d 1179 (Miss. 2016), but defendant correctly notes that this decision did not serve to extend *McArn* in the manner asserted by plaintiff. This court mentions this issue only parenthetically, since it does not believe that the facts of this case implicate *McArn*, even assuming that its holding might be applicable to a worker similarly situated to plaintiff.

again that Mississippi law generally frees an employer to fire an employee for any reason he sees fit. The only exceptions to the employment at will doctrine are exceedingly limited ones involving rather egregious fact patterns. In this court's view, the alleged scenario involving Dr. Murphy does not rise to this level, for the purpose of plaintiff's tort claims against CCA. Indeed, it does not strike this court as an uncommon scenario that personal animosity might develop between two employees and that, as a result, one of them might spread lies about the other in order to have him fired. That is what plaintiff alleges that Dr. Murphy did in this case, and this court notes that, because he has since died, he is not in a position to defend himself against these accusations. Even accepting plaintiff's allegations as accurate, however, they simply do not involve the sort of facts which might serve to impose liability against CCA under Mississippi's employment jurisprudence.

In the court's view, the strongest *potential* basis for plaintiff's asserting tort claims against CCA is his allegation that he was fired for refusing to change his medical diagnoses of inmates. Indeed, plaintiff does have a coherent *theory* as to why CCA might have had a motivation to fire him on that basis, although, as discussed below, he fails to support this theory with actual proof. With regard to plaintiff's theory, the record in this case does indicate that CCA incarcerates a large number of California inmates and that relevant regulations required any such prisoners who were diagnosed with psychological illnesses to be transferred back to their home state. Any such transfer would cost CCA inmates, and therefore profits, and this might well give rise to a plausible theory that plaintiff was fired for (correctly) diagnosing too many patients with mental illness, thereby negatively impacting CCA's bottom line. This court agrees that this would be a very troubling practice which might, at least conceivably, fall within the

limited exceptions to the employment at will doctrine.

Having said that, it does seem clear that any court wishing to apply *McArn* in the present context would have to tread carefully, lest it impose liability on the basis of legitimate medical disagreements among doctors. This court believes that strong public policy considerations support encouraging doctors to speak freely regarding the proper diagnosis of patients, and, as such, any court would need to take great care in applying *McArn* in this context, lest it unwisely discourage candid consultations among doctors. These reservations notwithstanding, this court would not be at all unreceptive to any actual *proof* suggesting that CCA encouraged its psychologists not to diagnose patients with mental illnesses, in the interests of protecting its own profits. This court believes that, if a particular plaintiff's proof established that a medical provider ordered diagnoses to be changed based on concerns regarding profits, rather than patient care, then he would at least have an argument that *McArn* should apply.

While the court thus believes that *McArn* might at least arguably apply in the medical diagnosis context, it seems clear that, in order to prevail, the plaintiff would need to present much stronger proof of wrongdoing by the defendant than plaintiff offers in this case. Indeed, to the extent that plaintiff mentions the diagnosis issue at all in the quotation above, he frames it as simply another reason for Dr. Murphy to have had personal animosity against him. True enough, in other sections of his brief, plaintiff does directly allege that CCA fired him for refusing to engage in illegal conduct, but he never offers any actual proof that this is the case. As quoted above, plaintiff does make a conclusory allegation that the personal animosity between himself and Dr. Murphy was "caused in part because Dr. Morris refused to falsify his medical records." Even if this court were to accept plaintiff's bare allegation in this regard as sufficient, the fact

remains that such an allegation would not suffice to establish liability against CCA under *McArn*.

Clearly, a termination resulting from false allegations arising out of a personal dispute among

employees is not the sort of conduct which the *McArn* cause of action was intended to address.

Moreover, this court concludes that plaintiff's brief attempts to improperly conflate

disagreements about a diagnosis among doctors with a falsification of medical records, within the

meaning of a Mississippi criminal statute. In his brief, plaintiff writes that:

> In this case, on three occasions Dr. Murphy asked Dr. Morris to change a
> diagnosis, which was in effect asking him to falsify his medical records. Each
> time Dr. Morris refused. . . . If Dr. Morris had changed his diagnosis in his
> medical chart, he would be guilty of a crime violating state law. Miss. Code Ann.
> § 41-10-1, "Falsification or destruction of medical chart" [provides that]:
>> (1) Except as otherwise provided in subsection (3), a person,
>> **knowing that the information is misleading or inaccurate**, shall
>> not intentionally, willfully or recklessly place or direct another to
>> **place in a patient's medical record or chart misleading or
>> inaccurate information regarding the diagnosis**, care, treatment
>> or cause of a patient's condition. A violation of this subsection is
>> punishable as follows: a person who intentionally or willfully or
>> recklessly violates this subsection is guilty of a misdemeanor,
>> punishable by imprisonment for not more than one (1) year, or a
>> fine of not more then One Thousand Dollars ($1,000.00), or both.

[Plaintiff's brief at 26-27]. Plaintiff's argument notwithstanding, it seems clear to this court that

a doctor might legitimately believe that another doctor has incorrectly diagnosed a patient and

should change the diagnosis on his medical chart, without incurring criminal liability under

§ 41-10-1. Indeed, it would seemingly constitute malpractice to leave an incorrect diagnosis on a

patient's medical records, which might well result in incorrect and potentially dangerous

treatments. For the reasons noted previously, this court believes that a rather strong presumption

should exist that a doctor attempting to convince another doctor to change his diagnosis is doing

so based upon a legitimate medical opinion. This seems particularly true here, where Dr.

Murphy is not alive to defend himself, and this court is forced to rely upon plaintiff's own, potentially self-serving, characterization of what he said.

While this court thus believes that plaintiff's brief undercuts his claims, it wishes to be clear that it is not faulting his counsel in this regard. To the contrary, it seems clear that counsel's briefing merely reflects the fact that the evidence in the record does not support plaintiff's tort claims. Counsel may not ethically misrepresent the evidence in the record, and he has properly chosen not to do so. In the court's view, this is a case in which the plaintiff had a coherent *theory* of liability, but the evidence developed during discovery simply did not support it. For example, in contemporaneous emails produced during discovery, plaintiff did complain about Dr. Murphy's micro-management of his job performance, but he failed to put CCA administrators on notice that he believed that he was being encouraged to engage in unlawful conduct. In his deposition, plaintiff provided very similar descriptions of his complaints about Dr. Murphy to CCA management, and this evidence has left his counsel with a rather poor hand to play, with regard to his tort claims. Indeed, in a case in which plaintiff seeks to impute *McArn* liability to CCA for the actions of one of its employees (or independent contractors) motivated by personal animosity, this court regards it as essential that the employer have had some reason to know that its employee was encouraging another to violate the law.

In the court's view, plaintiff's case suffers greatly from the fact that, while he now contends that Dr. Murphy asked him to engage in unlawful conduct, he never saw fit to document his concerns regarding this issue at the time. In his brief, plaintiff seeks to explain this absence of proof by stating that he "did not memorialize these three incidents, because Dr. Murphy had always discouraged him from placing anything in writing which would reflect badly on the

mental health unit and might be found in an audit." [Plaintiff's brief at 10]. Plaintiff's explanation in this regard seems quite inadequate, particularly since he did, in fact, document his concerns with Dr. Murphy's leadership in a June 24, 2014 email. That email, which plaintiff concedes was forwarded by Dr. Murphy to CCA management, made no mention of any concerns that he had been asked to engage in unlawful conduct.

The June 24, 2014 email is part of the record in this case, and this court will quote from it in full:

> Dan, I sat on this email for a long time and decided not to send it. Instead, the next opportunity, I want to read it to you face to fa [sic] in person.
>
> Dan, you need to hear this.
>
> You have done a marvelous job in establishing a psychological/bullet proof program at TCCF. My hat is off to you. I've complimented you on this from time to time along with the job you did today in your presentation.
>
> But a big but, you do not own this program. You are not in expendable [sic] but that is how you present yourself and someone needs to tell you this. At times you are most helpful, but at other times you become patronizing and condescending. Example, telling me it will take me a year to get up to snuff where I could help someone else. I resented that comment and others like it. I feel I have come a long way on [sic] a short amount of time. I know I am not there and probably will never be up to your standards. Ms. Powell has helped me immensely and, if even you were not in the picture, I would get there. Back off, Dan, take a breather, cut others some slack. I've given a clear message before, and, apparently need tol [sic] again, I learn better when I work through problems myself. The days I work alone, are wonderful. The days under your tutelage I feel like I'm treated like a small child. I don't need this job financially but accepted Duke's offer because it was enticing and would advance my knowledge of the field. As things stand, I'm reluctant to recommend it to others.
>
> You've repeatedly asked me what you could do. There you are.
>
> Forthrightly,
>
> JEM

[Plaintiff's exhibit 14].

This court regards plaintiff's email as quite important evidence in this case, since it involves a contemporaneous indication of the exact nature of the personal and professional conflicts which existed between plaintiff and Dr. Murphy. That email was sent before plaintiff had a financial incentive to assert a *McArn* claim, and, as such, it strikes this court as being particularly reliable. Moreover, plaintiff's admission that the email was forwarded to CCA management tends to give it even greater relevance, since it provides reliable evidence regarding defendant's understanding of plaintiff's concerns about Dr. Murphy. Given the importance of plaintiff's email, this court regards it as highly significant that his description of his issues with Dr. Murphy's leadership style does not even include a hint that he had been asked to engage in unlawful conduct. To the contrary, plaintiff's overriding concern in this regard related to his impression that Dr. Murphy was "patronizing and condescending" to him and that "under [his] tutelage I feel like I'm treated like a small child." Clearly, these are issues impacting plaintiff's own personal sense of pride as a medical professional, but they have nothing to do with any potential *McArn* claim. In the court's view, any members of CCA management who read plaintiff's email would have no reason to suspect that he was concerned that Dr. Murphy was encouraging him to engage in unlawful conduct. That being the case, it seems quite improper to impute Dr. Murphy's alleged actions to CCA, for *McArn* purposes.

Plaintiff's email is consistent with his own description, in his deposition, of the sort of complaints he made to CCA management about Dr. Murphy's leadership. In his brief, plaintiff accurately describes his testimony on this issue as follows:

After working for CCA for two or three weeks, Dr. Morris met with the warden to

complain about Dr. Murphy's micro-management of him. [Dr. Morris depo., pp. 134-36]  Dr. Morris told the warden about Dr. Murphy's abusive behavior, and that he did not sign on to be micro-managed by anybody. [Dr. Morris depo., p. 136]  Dr. Morris told the warden that he was thinking about leaving, and the warden told Dr. Morris not to leave, they needed him there. [Dr. Morris depo., p. 136].

[Plaintiff's brief at 6].  Thus, plaintiff's deposition testimony provides further confirmation that CCA management was made aware of plaintiff's complaints regarding generalized issues with Dr. Murphy's "micro-management" of his work, but not that they knew of any issues relevant to a *McArn* claim.

Plaintiff offers no other evidence which might serve to buttress his bare allegation that CCA fired him for refusing to engage in unlawful conduct, and his theory in this regard appears to be almost entirely unsupported by proof.  In the court's view, the closest plaintiff comes to offering any proof at all on this issue comes from the deposition testimony of Dot Strong, a nurse who served as the clinical nurse supervisor for TCCF from 2007 until May 2015.  In her deposition, Strong did testify that plaintiff had confided in her about his anger over the fact that Dr. Murphy had asked him to change a diagnosis. [Strong dep. at 9-10].  While Strong's testimony does tend to confirm plaintiff's assertion in this regard, the fact remains that, as a nurse supervisor, Strong had nothing to do with the decision to terminate plaintiff's contract.  Indeed, this fact is clear enough from the fact that Strong's deposition was quite complimentary of plaintiff as a physician and a person, and it thus seems clear that any decision to fire him would not have originated with her.

In the court's view, the fact that plaintiff raised his concerns regarding Dr. Murphy's actions with Strong begs the question as to why he could not have raised it with CCA managers

who were actually in a position to decide on his employment status. Once again, plaintiff testified in his deposition that he told CCA management of generalized concerns about Dr. Murphy's "micro-management," but such vague complaints are clearly insufficient to impute any liability to CCA under *McArn*. Moreover, from reading Strong's deposition, it does not appear that she interpreted plaintiff's complaints about Dr. Murphy as involving his objections to being encouraged to engage in unlawful conduct. Indeed, in his email to Dr. Murphy, plaintiff clearly objected to the perception that he was being treated like a "small child," and it appears to this court that his objections expressed to Strong may have been based upon similar concerns. Regardless, the basic fact remains that Strong was not in a position to decide upon plaintiff's employment status, and this court therefore regards her deposition testimony as falling well short of that needed to establish fact issues regarding plaintiff's *McArn* claims.

Having discussed the lack of evidence that plaintiff was fired for refusing to engage in unlawful conduct, this court now turns to the evidence regarding what *did* motivate CCA's decision to fire him. As noted previously, plaintiff asserts in his brief that he was fired based on "malicious lies" told about him by Dr. Murphy. In so arguing, plaintiff could not be talking about his refusal to change his medical diagnoses, since he admits doing that. The fact that plaintiff's reference to "lies" involves something else is seemingly confirmed by his argument that:

> A reasonable jury could conclude that Dr. Murphy sent the slanderous email up the chain which led to Dr. Morris' termination because he did not want Dr. Morris to have the full-time position due to personal animosity, caused in part because Dr. Morris refused to falsify his medical records.

[Plaintiff's brief at 18]. Thus, plaintiff appears to confirm that the "lies" which, he contends, led

to his termination were those set forth in an email sent by Dr. Murphy to CCA administrators shortly before his termination.

In his brief, plaintiff describes this email from Dr. Murphy to CCA managers as follows:

> On February 24, 2015, the day after Dr. Morris applied for the full-time position, Dr. Murphy composed an email and sent it to Dr. Gold, CCA's regional mental health director, who forwarded it to Montford and Dr. Terrell. [Montford depo. I, p. 25; Exhibit "17," Email Chain, last Email dated February 26, 2015].
> In the email, Dr. Murphy mentioned three incidents concerning Dr. Morris: 1) The first issue concerned patient T12 and an ideation of suicide that Dr. Murphy claims Dr. Morris did not handle properly in July 2015; 2) The second issue concerned patient C who Dr. Murphy claimed was severely psychotic in November 2015, and Dr. Morris did not properly diagnose; and 3) The third issue was a claim by Dr. Murphy that Dr. Morris had refused to assist Dr. Hamdan with a PRE assessment of patient G a week earlier. [Email Chain, last Email dated February 26, 2015].
> After receiving the email from Dr. Murphy, Montford reviewed the clinical care cases of the three incidents mentioned by Dr. Murphy. [Montford depo. I, p. 21] What Montford failed to do is discuss the issues raised by Dr. Murphy with Dr. Morris to find out his side of the story because if she had, she would have discovered Dr. Morris had done nothing wrong and Dr. Murphy's true motive in making these false claims. [Montford depo. I, p. 29].

[Plaintiff's brief at 11-12].

Thus, plaintiff concedes that the alleged "lies" by Dr. Murphy which led to his termination related to simple issues of substandard patient care which had nothing to do with refusing to change a diagnosis. That being the case, the evidence in this case, even as described by plaintiff, suggests a simple case of disagreement about whether good cause existed to fire him, based on rather mundane allegations of poor job performance. Clearly, these allegations do not implicate any of the concerns motivating the *McArn* decision. That being the case, even if this court were to assume that plaintiff was an employee rather than an independent contractor or that the Mississippi Supreme Court might apply *McArn* to independent contractors in an appropriate

case, this would not be the proper case in which to do so. This court therefore concludes that plaintiff's *McArn* claims lack merit and are due to be dismissed.

This court next addresses plaintiff's tortious breach of contract claim, which lacks merit for many of the same reasons discussed above. As noted previously, "[t]ortious breach of contract requires, in addition to a breach of contract, some intentional wrong, insult, abuse, or negligence so gross as to constitute an independent tort." *Fritz,* 523 So.2d at 19-20. Clearly, these are quite vague standards, and it is therefore difficult for this court to address them with any specificity. Given the conclusions stated above, however, it should be readily apparent that this court does not regard this case as one in which CCA may validly be said to have committed "an intentional wrong, insult, abuse, or negligence so gross as to constitute an independent tort." In contending otherwise, plaintiff argues that:

> A reasonable jury could conclude that Dr. Murphy held malice against Dr. Morris because Dr. Morris would not change his diagnosis. Because of this malice, Dr. Murphy made false accusations against Dr. Morris the day after he applied for the full-time position. Dr. Baxter never conducted an independent investigation into these claims, and instead, relied upon the email sent by Dr. Murphy. As such, Dr. Murphy's malice can be imputed to Dr. Baxter and CCA, since Dr. Baxter made the final decision to terminate Dr. Morris.

[Plaintiff's brief at 31]. This court has already noted its disagreement with plaintiff's attempts to impute Dr. Murphy's personal animosity against him to CCA, and it incorporates its prior analysis in this regard here. Additionally, this court concludes that any alleged failure by Dr. Baxter, on behalf of defendant, to conduct a full investigation into Dr. Murphy's allegations against him is insufficient to give rise to a tortious breach of contract claim. That claim will therefore be dismissed.

That brings this court to the one claim which, it concludes, *does* survive defendant's

15

summary judgment motion: plaintiff's breach of contract claim.  As discussed below, this court

concludes that the evidence as described by plaintiff does tend to create fact issues regarding

whether good cause existed to fire him without thirty days' notice, which requires a "material

breach" of the contract in this case.  Based upon defendant's briefing, it appears to recognize that

it might have been wiser to simply give plaintiff his thirty days' notice, after which time his

contract could have been terminated even without a finding of material breach.  Specifically,

defendant writes in its brief that:

> This is a straight-forward case over an independent contractor agreement between
> the parties that contained a provision allowing "either side … [to] cancel the
> contract with thirty days notice."   Dr. Morris negotiated the inclusion of that
> provision (with the aid of attorney Joseph T. Wilkins, III).  *Id.*  ("I would also like
> a clause in the contract allowing either side to cancel the contract with thirty days
> notice.").  Thus, if CCA had provided Dr. Morris with notice that it was
> terminating his independent contractor agreement and paid him 30 days' pay (and
> simply told him to stay home), he would not have a claim that could survive a
> Motion to Dismiss.

[Defendant's reply brief at 1].

This court tends to agree with defendant that, if it had simply chosen to exercise its thirty

day option, then plaintiff would not have any valid claims to assert in this case.  The fact remains

that defendant chose a different course of action, however, and the law does not exist to save

parties from the consequences of their poor decisions.  This court also notes that plaintiff has

substantial proof that he was a good psychologist, and Dot Strong's testimony seems particularly

helpful proof for him in this regard.  Additionally, plaintiff's brief offers a detailed rebuttal to the

three issues of allegedly substandard care [plaintiff's brief at 12-16] which CCA relied upon in

firing him, and this court concludes that this case involves rather classic fact issues appropriate

for resolution by a jury.  Finally, the fact that the incidents described in Dr. Murphy's email

occurred several months previously raises legitimate questions, at least in this court's mind, whether a "material breach" of the contract actually occurred. It seems clear that the event which caused Dr. Murphy to write his email was the fact that plaintiff applied for a full-time position at the prison. However, it can certainly be argued that, if Dr. Murphy believed that the breaches in question were grounds for immediate termination, then he should have raised them much sooner. This court therefore concludes that defendant's motion to dismiss plaintiff's breach of contract claim is not well taken and should be denied.

That brings this court to defendant's attempts to limit plaintiff's contractual damages in this case. In its summary judgment brief, defendant overlooks the fact that plaintiff's complaint included a one-sentence claim for breach of contract, and it argued that, regardless, his contractual damages should be limited to thirty days' salary. Specifically, defendant writes as follows:

> Dr. Morris only plead malicious / tortious breach of contract. He did not plead simple common law breach of contract. If he had, CCA has shown why there is not breach of contract. *See* Section II.A., *supra*. Nevertheless, even if he proved a breach, his damages would be limited to the contract's 30- day notice provision. CCA claimed material breach of the contract by Dr. Morris; however, if it were wrong, the maximum damages would be 30 days' compensation because it is undisputed that either party was entitled to end the contract with 30 days' written notice. Ex. F (Agreement) § III.

[Defendant's brief at 24].

In his brief, plaintiff points out that he did, in fact, allege that "[d]efendant is liable to plaintiff for breach of contract and tortious breach of contract" in his complaint. [Complaint at 28, paragraph 14]. In its reply brief, defendant argues that this is insufficient to plead a breach of contract claim, but, within the context of this case, this court does not agree. Indeed, defendant

acknowledges in its briefing that plaintiff's tortious breach of contract claim includes breach of contract as an element, and defendant fully briefed the issue of breach of contract in addressing that claim. In considering the motion for summary judgment in this case, this court has duly considered defendant's breach of contract arguments, and, accordingly, this is not a case where defendant has been prejudiced or ambushed by a new argument. To the contrary, the breach of contract issues in this case are quite straight-forward, involving the question of whether defendant had sufficient cause to terminate the contract without providing thirty days' notice.

This court has concluded that triable fact issues exist regarding plaintiff's breach of contract claim, but this does not alter the fact that defendant fully addressed that claim in its briefing. This court will therefore not dismiss plaintiff's breach of contract claim on the basis of the cursory nature of his complaint's allegations in this regard, and it will turn to the issue of what damages are available for breach of contract under Mississippi law. In his brief, plaintiff notes that there is Mississippi authority which, at least potentially, supports emotional distress damages for breach of contract. Specifically, plaintiff writes that:

> Finally, the Mississippi Appellate Courts have determined that mental anxiety and stress damages are possible for a simple breach of contract case:
>> We take this opportunity to clarify the burden for recovery of mental anguish and emotional distress in breach of contract actions. Plaintiffs may recover such damages without proof of a physical manifestation. Furthermore, expert testimony showing actual harm to prove mental injury is not always required. However, the plaintiff must show (1) that mental anguish was a foreseeable consequence of the particular breach of contract, and (2) that he or she actually suffered mental anguish. Such generalizations as "it made me feel bad," or "it upset me" are not sufficient. A plaintiff must show specific suffering during a specific time frame. These requirements are not different from the requirements to establish physical pain and suffering. *University of Southern Mississippi v. Williams*, 891 So.2d 160, 172-73 (Miss.

18

2004) *Morris Newspaper Corp. v. Allen*, 932 So. 2d 810, 818
(Miss. Ct. App. 2005).

[Plaintiff's brief at 32-33]. Plaintiff has correctly cited Mississippi authority, which does seem to

establish, at least potentially, a quite generous measure of damages for breach of contract. While

this court can understand an argument that this serves to blur the lines between tort and contract

damages, its duty in diversity cases is simply to apply Mississippi law. It is thus significant that,

in its reply brief, defendant does not argue that plaintiff incorrectly described Mississippi law in

this context, and this court therefore believes that it has tacitly conceded the fact that emotional

distress damages are at least a possible element of recovery for breach of contract under

*Williams*.

In light of its ruling today, however, this court believes that plaintiff seeks to overplay his

hand in this context. In his briefing, plaintiff argues that he should be entitled to recover

emotional distress damages for Dr. Murphy's allegedly harsh treatment of him, but this court

does not agree. Specifically, plaintiff argues that:

> In this case, Dr. Morris can show that he suffered mental anguish, which was a
> foreseeable result of Dr. Murphy's treatment of Dr. Morris. Initially, Dr. Morris
> was excited about going to work for CCA:
>> When he went to work there, he was very happy about it and --
>> being experienced in the prison settings and the psychologist who
>> was ostensibly in the process of retiring was training him and --
>> and the person who, I guess, was his actual supervisor was
>> someone who did not understand psychology and didn't really have
>> any real knowledge of particular authority other than on paper,
>> which made it formal, but -- so he essentially was having to answer
>> to this other psychologist who had created a really nice program,
>> but was a pretty severe mother hen about it and wanted to basically
>> clone himself rather than to show Joe Edd the ropes and release
>> him to do his job. So he would micromanage. He would go over
>> reports . . . I guess like a red pen and make notes . . . .

[Exhibit "24," Morris Alexander, Ph.D. deposition, pp. 11-12] Eventually, the micro-managing took a toll on Dr. Morris:

> Well, he was worried. He . . . told me he was stressed about it. At one time he did say it disturbed his sleep. . . . most of the time, he was just kind of wrestling with it, getting tired of it, having these instances accumulate and become tiresome and bothersome and repetitive. [Dr. Alexander depo., p. 12]

[Plaintiff's brief at 33].

In the court's view, plaintiff's argument seeks to extend *Williams'* holding too far. Dr. Murphy is not a defendant in this lawsuit, and the only potential contractual damages in this case relate to CCA's decision to terminate his contract without thirty days' notice. In the court's view, any emotional distress which plaintiff might have suffered before this date, including any distress resulting from Dr. Murphy's treatment of him, is simply not compensable under *Williams*. This court therefore concludes that plaintiff should not be permitted to present any evidence at trial regarding any distress unrelated to CCA's decision to terminate his contract without notice. It is unclear to this court what evidence plaintiff may be able to present regarding his distress resulting from any breach of contract by CCA, and it is likewise unclear whether that proof would be legally sufficient under *Williams*. This court will therefore not attempt to prejudge this issue, and it will instead decide at the jury instruction stage of trial whether or not plaintiff has been able to establish fact issues regarding his ability to recover for emotional distress under *Williams*.

In light of the foregoing, it is ordered that defendant's motion for summary judgment is granted in part and denied in part. Defendant's motion to strike [74-1] plaintiff's affidavits is

granted in part and denied in part.[2]  Defendant's motion to exclude the testimony of J. Morris

Alexander, Ph.D. [50-1] is dismissed without prejudice, with instructions to re-file the motion in

light of this court's ruling today on the emotional distress issue.[3]

This, the 16th day of May, 2017.


/s/ Michael P. Mills
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

---

[2]Plaintiff submitted two affidavits setting forth his version of the facts of this case, and defendant submitted a lengthy list of objections to those affidavits, based on grounds such as hearsay and that they contain conclusory assertions.  This court has reviewed the affidavits and objections, and it finds some of the objections to be valid, some to be invalid and many to be moot in light of its ruling in defendant's favor on plaintiff's tort claims.  With regard to plaintiff's breach of contract claim, this court has given very limited weight to plaintiff's affidavits, with considerable attention given to whether or not the statements therein would be admissible at trial.  This court believes that some of the information in the affidavits is admissible and useful as an indication of what plaintiff might prove at trial regarding whether or not he committed a material breach of his employment contract.  This court will therefore grant defendant's motion to strike in part and deny it in part.

[3]In so ruling, this court notes that the parties did not have the benefit of its ruling today on the emotional distress issue, when they initially briefed the admissibility of Dr. Alexander's proposed testimony relating to this issue.  This court therefore concludes that the parties' initial briefing is outdated and should be revised to address its ruling today.